Our first case this morning is Systems Integrated versus the Navy. Mr. Donovan? Yes, Your Honor. You may proceed. Thank you, Your Honor. Your Honor, this appeal does not require a radical departure or any departure at all from fundamental basic rules of contract interpretation. The principal issue is the meaning of the common English word terminate or terminated as used in the equitable distribution provision of the limitation of funds clause. Doesn't the contract contain a terminations clause? Indeed. Wouldn't that tell us what it means? Wouldn't we look to that clause and say, well, this is what they mean by termination? You would, Your Honor, but when the common practice, both in the FAR drafting guide and common English usage, when you refer mean a specific clause, you capitalize the term. And that is not done here. As we point out in our brief, when the government wanted to refer to that specific termination clause in subparagraphs E and F2, it used capital T, termination. So that's the difference. When they use the phrase- Case terms on capitalization? That is one- that is a- reinforces the argument that the plain meaning of terminate should apply. In other words- Just the termination is such a clear legal term with legal implications that it permeates all of our contract law. There are terminations, fault terminations, convenience terminations, all kinds of terminations. I'm just having difficulty finding a way to look at that other than in the context of the contractual provisions. The termination- there really are only two types of termination, I believe. Termination for default or termination for convenience. As a general rule, capital T in terms of formal clauses. But in this- in a case, a contract involving limitation of funds that is incrementally funded, that often doesn't make sense. You can terminate an incrementally funded contract simply by not funding it anymore. You wouldn't- as in this case, systems integrated had fully performed. You certainly wouldn't terminate them for default because they were finished and they had complied. You wouldn't terminate them for convenience because the contract was over. There was no need to do it. But you could terminate them by not funding it further. And that's- Where is that terminology used to refer to a failure to fund further as being a termination? It is not- I am referring- it is not defined that way, Your Honor. I am using the common English meaning or usage of the word terminate, in other words, to bring to an end or a conclusion to reach that- to make that point. Well, if we disagree with you about the meaning of termination here and conclude, as Judge Rader was suggesting, that it refers to the termination clause, is that the end of the case? Do you lose? No. No, Your Honor. Not at all. What other arguments do you have? Well, in this case, you terminate- the equitable distribution provision, as shown by the facts of this case, applying the government's and the board's interpretation, deprives this contractor of potentially over $600,000 worth of costs it incurred and benefited the Navy with. So if the Navy had acknowledged the existence of the clause- You're not answering my question. My question is, assuming that termination refers to the termination clause, what other arguments- we reject your position on that. What other arguments do you have for reversal? The government should have terminated the contract. It should have exercised its discretion to terminate the contract pursuant to those formal procedures. Couldn't you have initiated the termination? Not in this case, Your Honor, because you're referring, I believe, to D and E. Yes. Yeah, D and E. It says that upon the written request, your written request, the contracting officer will terminate this contract. But, Your Honor, if you look at the predicate for that is in D. First, you have to give notice, 60 days advance notice of the impending overrun. Then you go to E. If after the notice they don't fund it, then you can- the contractor, unusually, can request or almost require a formal termination. In this case- Then they couldn't have requested the termination because they didn't supply the notice that they were exceeding the funds available? Yes, Your Honor, and they weren't even aware. Why couldn't they have given the notice? Because they weren't aware that they were exceeding the cost. Maybe they should have been aware. They should have been aware, Your Honor. I mean, nobody wants to- no contractor wants to be in this position. But it's not an uncommon situation in these types of contracts that it often happens that the indirect rates, you finalize your rates after completion. That's under the Clause 52-216-7, allowable costs and payments. It requires determination of actual costs after completion of performance. Well, it often occurs in two cases I know that I cited. Bruce, General Electric, and Breed, the Board of Decision and Breed, both involved where the post-performance audit determined the indirect rates were much higher, and it turned out that they had been under-billing, the contractor had been under-billing all the time and didn't know that he had a cost overrun. So D&E just don't operate in this situation. The Equitable Distribution Clause, I think, on its face, applies to the situation where the contractor didn't know and can't excuse his failure to know of his cost overrun, yet doesn't want to give the government something for nothing and penalize the contractor for performing. That's the purpose of the clause. And I submit, Your Honors, that to produce the harsh result, and this is a harsh result in this case, the contract language should be far clearer than it is here. The government could easily have said in the Equitable Distribution Clause, if the contract is terminated, per the termination clause, as it did in E. They could have also said, instead of using the word terminated, which is so imbued with legal meaning, they could have said canceled or completed or finalized. They could have found some word other than terminated, which seems to clearly indicate awareness of the termination clause. Yes, I agree, Your Honor, and that would have been better. And I puzzled over why they phrased it this way. And even the first sentence of K, which says, notwithstanding or nothing in this clause shall abrogate the government's right to terminate. What is so unusual? The government doesn't have to have a clause necessarily to say it has a right to terminate. Under the Christian doctrine, termination for convenience is incorporated. Common law right to terminate for default is there. Well, I think the answer is, again, in paragraph E. Paragraph E is a very unusual provision. The Council of Government even noted it in their brief. That is, it's giving the contractor the right to, in effect, exercise a formal right of the government, a formal government termination clause. So the reason for this predicate language in K is my supposition or my offer of why it's there in the first place, is simply to reinforce or eliminate any possibility of confusion that by effectively giving the contractor the right to terminate in E, the far drafter didn't mean to abrogate the government's general right to terminate, either for default or convenience. But I agree with you, Your Honor, that they could have eliminated this problem if they'd used a better, a more general word. But, again, lowercase means to bring to an end or conclusion. That's as reasonable, I submit, an interpretation that relies on plain, ordinary meaning has got to be within the zone of reasonableness so as to call for the exercise of the rule contra proferentum. The government drafted this clause. Systems Integrated had no say. This is almost a classic contract of adhesion. They had no say on this language. And so in those circumstances, unless the court concludes that Systems Integrated's interpretation is nowhere close to the zone of reasonableness of possible interpretations, then Systems Integrated must prevail under the rule contra proferentum. Well, that's not what we said. That's not what our cases say. Our cases say that contra proferentum is a canon of last resort. True. Right? Yes. It doesn't say that if there's a possible interpretation that you turn to contra proferentum. It says if you can't otherwise construe the contract, you turn to contra proferentum. Yes, I agree, Your Honor. I agree. And I'm saying that, well, the court could conclude that this interpretation, based on the zone of reasonableness, the court could conclude that, well, that may be so, but the government's position is far better and you don't even reach that. That is a possibility. I see I'm in my rebuttal time. Thank you very much. Thank you, Your Honor. Mr. Donovan? Mr. McNamara? May it please the court, that's why this reading of the equitable distribution term here is entirely inconsistent with the rest of the contract. It's inconsistent primarily, most importantly, with the terms and purpose of the limitation of funds provision in which the equitable distribution clause appears. Well, why is there a different approach in the limitation of funds clause and the limitation of cost clause? I mean, that's basically what they're complaining about. They're saying under the limitation of cost clause, there would be an equitable distribution. It doesn't seem fair that the limitation of funds clause should be different. Is there any reason why the two clauses are written differently? I'm not sure, Your Honor. I don't know, because the clauses are very similar, except for that crucial phrase that in the limitation of costs clause, if the costs under the contract are not increased, then the contractor is entitled to an equitable distribution. That's simply a difference in the clauses. I don't know what the rationale for that difference is, but certainly in the limitation of funds context where the government can only spend what it has allotted under the contract and the clause makes plain that the government is not obligated to spend anything more, that if the contractor goes out and incurs expenses beyond what's allotted, the government is simply not obligated to reimburse the contractor for those costs. The limitation of costs clause says effectively the same thing. Again, I don't know if I'm answering your question. I'm effectively saying the language of the clauses is different. A reasonable contractor should be able to look at that language and say the government has to terminate the contract, and if the government doesn't terminate the contract, then we are not entitled to an equitable distribution. The notion that we have to read terminate as it is defined in the dictionary I think is sort of skipping the step, the important step that we read a contract so that it is in harmony with itself, that we look to other parts of the contract to figure out what a term in a contract means. How would you explain the absence of the capitalization? I realize it's a small point, but throughout the contract it is referred to in a capital T way when it's meant to refer to the termination clause, and normally you would I'm sure agree that in contract interpretation we would give the ordinary and plain meaning to terms otherwise not defined. So why, I mean, as I understand the contractor's argument, it is that when they used termination with a little t, they weren't referring to the clause, but rather the plain meaning should occur. Well, a couple of things. Typo? I'm sorry. Are you going to tell me it's a typo? No, it's not. No? That would be a convenient argument, but I won't make it. A couple of points. One, the plain meaning, there's nothing that says the plain meaning of a term, plain and ordinary meaning of a term has to be coterminous with exactly what's in the dictionary. The plain and ordinary meaning of a term could be, and is certainly typically reasonably the meaning of the term that's given in the rest of the contract and in the world of government contracts. But aside from that, I mean, even looking at Section E, the contract does capitalize the phrase termination clause, but it doesn't capitalize the verb will terminate this contract. It leaves that uncapitalized. And so, particularly when given the first sentence of Section K, nothing in this clause shall affect the right of the government to terminate this contract. Well, the right of the government to terminate the contract is circumscribed and defined in the contract's termination clause. The government can't terminate this contract in any other way beyond that clause. It's also notable that this clause begins if this contract is terminated. It does not say when this contract is terminated. And under S.I.'s reading, that would be the result because under S.I.'s reading, the contract would terminate, in quotes, no matter what, no matter what happened here, the contract would be terminated. That is inconsistent with the mechanism that is set out in the limitation of funds clause that provides that if a contractor is getting near the funding ceiling, that the contractor has to alert the government and give the government the affirmative choice of how to proceed, whether to terminate the contract or whether to increase, if possible, increase the funding. Is there a good faith and fair dealing issue here that neither party seems to have known exactly where the funding level was, they were entering into another contract? There's a lot of circumstances that just kind of suggest that there would have been accommodation on both sides. That maybe is best summed up as a good faith and fair dealing sort of an issue. No, I don't think so, Your Honor. I mean, the circumstances were this. The contractor did not know how much it was spending on this contract. It didn't even know, it was required if it reached 75% of the funding of the contract to provide notice of that fact. It didn't even know that it was within 75% of what it was spending. That's the principal circumstance there is that the contractor didn't know what it was spending. We couldn't know at the time what the contractor was spending. When the contractor, when SI gave its final report, this contract came in under budget. We didn't know for years afterward that SI had gone and spent more money than was allotted for under the contract. The notion that we were somehow, the board specifically found that the government here did not withhold any funds, did not do anything to gain some sort of contractual advantage here, that somehow we knew that we were shorting the contractor. What that has to assume is that we knew the contractor was exceeding what it was allowed to spend, and we were shorting the funding so that we could then deny them an equitable distribution. We didn't know what they were spending. They didn't know themselves what they were spending. SI cites to the General Electric case, and I don't know why, because in General Electric, the court of claims specifically confronted a situation just like this one, where in a limitation of costs context, it doesn't deal with equitable distribution, but the contractor came back, and General Electric came back and said, we want more money under this contract, under the limitation of costs clause. The contracting officer denied his discretion in denying us more money. This court said the contractor did not know, General Electric, you didn't know what you were spending because your accounting system was in disarray, so no, the contracting officer did not abuse his discretion. I may be getting that confused. Either that's the holding of the case, or the court makes very clear that the accounting system of the contractor is important, that that's a crucial factor in the analysis. But the government's getting the advantage of equipment bought  Isn't there some good faith required? No, Your Honor. Our rights under this contract are set out very plainly in the limitation of funds provision. The limitation of funds provision makes very plain that we are obligated to reimburse the contractor up to the amount of funds that we have allotted under the contract. It's there to protect the public fisc. It's there to protect the government. It's the plain purpose of that clause. If the contractor doesn't know what it's spending, and it's providing, we don't have a choice. We're given this property. Obviously, sure, yeah, we got the benefit of it. We took the property. But we didn't know that we were taking property that we couldn't pay for. So to say that somehow the equities are in SI's favor. Don't you have some obligation to keep track of what you're receiving as much as they do, to keep track of what they're paying? We have an obligation to get vouchers under the contract, I suppose, and to know sort of generally. We are dependent upon the contractor to know what the contractor is spending. The contractor here was complying, providing reports all along the way. Those reports indicated that the contractor, at the end of this contract, they were $8.68 under budget. That's what we knew. We thought that this contractor. They had no independent way of knowing what they were spending. No, we didn't. We weren't going out and auditing them over the course of the contract, and that's not the way it works. We are dependent on the contractor. You briefly used the term, this contract fell through the cracks. Well, that's. Is there some mutual responsibility of the government to keep important contracts from falling through the cracks? That was a phrase that one of the witnesses used, but I don't know. The implication is that instead of simply going along with the incrementally funded nature of this contract, we were supposed to somehow terminate this contract affirmatively. Termination, to be clear, is not the sort of ministerial act that SI lays it out to be. Termination requires, makes the government incur various obligations and duties and responsibilities, and so the notion that it sort of fell through the cracks, we stopped funding the contract and moved on to another contract, but that was just the reality, and the reality was it wasn't fully funded. SI knew that it wasn't. I understand one thing. The contract says that if the contractor is going to exceed 75 percent of the ceiling price, they've got to notify you. Well, they came within $8 of the ceiling price. Didn't the government at some point know when it's writing these checks out to the contractor that, wait a minute, we've now written checks for more than 75 percent of the contract price, and yet we've heard not a peep from the contractor and we know they're still doing stuff? I mean, isn't there a way kind of along the line of Judge Rader's questions that the government is aware of where it is in the contract scheme simply because of the checks the government has written to reimburse the contractor, and when you came so close to the ceiling, I've got to think the government knew at some point they were above the 75 percent mark and yet weren't getting the required notice. Right. Well, a couple of things. One is if you look carefully at the dates here in finding 22, and it's on page 11 of the joint appendix, we received that notice that the cumulative bill cost was $8.68 below the allotted estimated contract cost in May of 1992. For example, I don't know. There's nothing in the board's decision about all of the costs that SI is seeking here, all of the property that it purchased, but we do have specific dates here concerning these computers, which were $250,000, $350,000 worth of those costs. Does the government have any obligation to give the property back since they're not going to pay for it? I mean, you agree that the government has now accepted property that was paid for in excess of the ceiling price. What if SI can't get compensation for that? We can't force the government to pay because maybe we agree with your contract interpretation, but what about, okay, well, then give it back. You've acknowledged that you've taken something you haven't paid for because it exceeded the price, and the government should have had the right to make a decision. Well, no, don't do any further work, or yes, do further work. And so if it's possible to give that further work back, if it's in the form of actual computers or things like that, what does one do in this situation? Do you have any responsibility to give it back since you're taking something you're admitting you're not paying for? Well, not pursuant to the contract. I mean, we took title to the material under the contract. But you've acknowledged you took title to material which you did not pay for, and now you're claiming you don't have to pay for, and maybe we end up agreeing with you on that. Well, then, but don't you have to give it back? You're not going to pay for it? I mean, you admit that it's in excess of this stuff that you're getting is stuff that you did not pay for in these other payments that you made to SI. And that goes to, and I don't, certainly stop me if it seems like I'm evading your question because I don't mean to, but that goes to the delay here that SI is bringing its claim. The board rejected our latches defense, but it found that SI unreasonably delayed in bringing this claim. We did not, SI brought its equitable distribution claim in 2003. They asked for an equitable distribution first in 2003. These contracts ended a decade before. Okay, so if there wasn't a delay, the government would be giving the computers back? If there wasn't a delay, then, I mean, again, that's assuming that they have a right to equitable distribution under the contract. The issue here is not whether they get paid. The issue is whether they get the property. That's what the clause is addressed to, right? Right, yes, it is. I mean, they can't exceed, they can't get paid beyond the funding ceiling. And they're not claiming that? Well, they're claiming that we breached the contract, and they're asking for $630,000 in damages. I thought they were seeking equitable distribution of the property. They are, and they say that that means that they can get paid for the property, effectively. I mean, they don't want the property back. The property isn't worth anything anymore. This is 10-year-old computers. By now it's 2008. It's 15-year-old computer equipment. It's museum pieces now. But if they had brought this claim, if they had asked... The difficulty I think we're all having is that, yes, maybe SI was lazy, inadvertent, mistaken, and not keeping track. Maybe the government was lazy, inadvertent, mistaken, and not keeping track. But the government gets a big advantage out of it. There's kind of an advantage in government laziness here. Is that the way the system ought to work? Well, again, Your Honor, to say that we were, for one, SI delayed so long in bringing this claim that even if we wanted to give the property back, and that may have been an equitable distribution, now we can't effectively. We've either lost it or it's valueless. We've given it away. If you look at the course here of SI's claim, it repeatedly failed to either comply with what the auditors were asking for, even after their rates were determined. They waited two years. That's not the ground for the decision here. The ground for the decision here is that there is no right to an equitable distribution of the property. That's right. Right? So that's, for the moment, what we have to review. And you say that the contract doesn't allow an equitable distribution under these circumstances. They say it does. And that's that. And if you're asking about fairness, I'm just simply trying to explain why this result is fair. But, yes, I mean, this case can be decided as the board decided it based upon the plain language of the contract. They have no right to equitable distribution. Thank you, Mr. McNamara. Thank you. Donovan, you have about five minutes left. It's 4.42. I'll be brief. I'd like to first address Judge Dyke's question about the limitation of cost clause versus limitation of funds, and that would lead me to a comment on Judge Rader's question about fell through the crack. The limitation of cost clause is used when the contract is fully funded. I understand when the two clauses are. Okay. And so, in that circumstance, the money is there, so the way you conclude the contract, there you have to use the termination procedure, either termination for default or termination for convenience to conclude the contract. Limitation of funds, however, you set the ceiling, but you haven't funded all the way. So there's a third way. It's unique. Under a limitation of funds clause contract, you can terminate that contract not only through the formal methods, but also by simply not funding the contract further. Now, Your Honor mentioned the comment, and it was the government contracting officer technical representative said, you know, we just forgot about it, we didn't notice it, and fell through the crack. The likelihood, and we refer to this in our brief, one of the other contracts involved in the case, but not in the appeal, 6021, they ended up $165 short of funding of the ceiling amount. All they did was they just amended the contract to reduce the ceiling to the actual funding. Now, you know, why couldn't they have done that here? Well, it was inadvertence, and should inadvertence deprive a contractor of over $600,000? That's the bottom line. Because if they'd done it, the LOC clause would be in the contract. We wouldn't be here today. And I'd just like to point out, to follow the government's and the board's interpretation to the logical conclusion, there's several unreasonable results, and I'll just mention one. Assume a contractor who has not performed very well. He's not on time, he's deficient in his performance, just generally unsatisfactory. The government terminates for default. But under the clause, if it later turns out he had an overrun that he didn't know about, he's going to be entitled to an equitable distribution. Compare that defaulting contractor to the contractor who fully performs on time, meets the contract's funding limit, is perfect in every way, but the contract just simply concludes. Obviously, you wouldn't terminate that contract for default because he's fully performed. You wouldn't terminate it for convenience because that's a useless act because the contract is over. But what's the effect? The defaulting contractor is rewarded. He gets an equitable distribution. The good contractor, the exemplary contractor, is penalized. He doesn't get an equitable distribution. On that kind of basis... It's in your own hands. You can create a situation where there has to be a termination by giving a notice that the costs are exceeding the available funds. Why is it so burdensome to put that burden on the contractor under this clause to say that you have to give notice if you're getting into an overrun situation? That is the general rule. You do have to give notice. And what I'm suggesting, and I think the precedents are clear, the equitable distribution clause is a notwithstanding failure to give notice provision designed to... That's not the way the Board of Contract Appeals interpret it. They said your remedy is to give the notice, then you can get it terminated, then you can get an equitable distribution. But if you don't give the notice, then you don't. And I submit, Your Honor, that that's an unreasonable interpretation. That's why I'm asking, why is it unreasonable to require that the contractor give notice in order to trigger the equitable distribution clause? Well, why have the equitable distribution clause at all then? Because it's already clear in the limitation of costs, limitation of funds clause, if you don't give notice, there's no obligation by either party to perform. So what's the purpose of the equitable distribution clause? It's notwithstanding notice. That's the only possible explanation. And the precedents, which I admit are mostly or all at the Board, establish that. My time is up. Thank you, Your Honor.  The next case is the Board of...